CHARLEVILLE *et al.*, Appellants, *vs.* CHOUTEAU *et al.*, Respondents.

1. At an executor's sale, in Spanish times, no bidder presenting himself for a common field lot which was subject to a charge for keeping the common fence in repair, the same was by the lieutenant governor transferred to the executor, upon his assuming to bear the charge.　*Held*, the transfer was to be regarded as a governmental act, made upon considerations affecting the public, as well as from a regard to the interests of the estate, and did not come within the rule that an executor could not purchase property which it was his duty to administer.

Charleville v. Chouteau.

2. A party claiming title under one of two conflicting Spanish grants cannot obtain the benefit of a confirmation upon the other, even though the former may have been illegally purchased by the confirmee before confirmation.
3. As between two Spanish grants, it is well settled that the one first confirmed is the better title.

## *Appeal from St. Louis Circuit Court.*

This was a petition in the nature of a bill in equity, filed against the heirs of Auguste Chouteau, by Victoire Charleville, claiming to be the daughter and sole surviving heir of Victoire Richelet Verdon. The children of Victoire Charleville, claiming under her, were subsequently made parties plaintiff. The suit involved the title to one by forty arpens of land, known as the Laroche arpent, embraced within a tract of eight by eighty arpens, known as the Chouteau Mill tract, which was confirmed to Auguste Chouteau by the first board of commissioners in 1810. The Laroche arpent was reported by the recorder of land titles for confirmation to Laroche's representatives, and confirmed by the act of congress of April 29, 1816.

The petition stated that Victoire Richelet Verdon died seized of the land in controversy, in 1796, and by her last will appointed Auguste Chouteau her testamentary executor; that said Chouteau undertook the trust of executor and also that of guardian of the children of the testatrix; that, on the 30th of October, 1796, the said executor proceeded to make public sale of all the goods, effects and estate of the testatrix, and at said sale became the purchaser of the one by forty arpens in dispute, contrary to law and in breach of his trust as executor; that after the country was transferred to the United States, Chouteau induced the government to confirm the land to him in his own name; and that he and his heirs had since enjoyed the rents and profits, and received the proceeds of sales. The prayer of the petition was for an account, and for the title to that portion still in the possession of the defendants or any of them.

32—VOL. XVIII.

At the trial, the plaintiffs introduced the following evidence :

1. Marriage contract between Joseph Verdon and Victoire Richelet, dated May 9, 1772.

2. Articles of separation between Verdon and wife, dated March 7, 1785, by which she became sole owner of all the property then owned by them, excepting a few small articles reserved to the husband.

3. The will of Victoire Richelet Verdon, dated September 29, 1796. Auguste Chouteau is appointed executor, with power to sell all the property of the testatrix, real and personal, and divide the proceeds among her children, after paying debts. No specific mention is made of the property in dispute.

4. Inventory of Madame Verdon's estate, dated October 24, 1796, made under the directions of Zenon Trudeau, lieutenant governor. One of the pieces of property inventoried is described as follows : " Half an arpent of land behind the fort, being contiguous to the land of Auguste Chouteau and Marly, valued ten dollars."

5. An account of the auction sale of Madame Verdon's estate, signed by the lieutenant governor, by Auguste Chouteau, and by two witnesses. The last entry in this account relates to the transfer of one half by forty arpens to the executor and is set out in the opinion of the court.

6. Auguste Chouteau's settlement of Madame Verdon's estate, in which he describes himself as guardian of her children, dated July 20, 1799.

7. List of documents filed by Auguste Chouteau with the recorder of land titles, in support of his claim to the Mill tract, consisting of the following : 1. A concession to Laclede, dated August 11, 1766, for eight by eighty arpens, extending from the land of Dion to the Little river. 2. A deed from Laclede to Chouteau, dated July 4, 1779, for water mill, &c. 3. A deed from Louis Vachard and wife to Chouteau, dated October 19, 1784, for two by forty arpens, bounded on one side by land of Beaugenon, and on the other side by that of Louis Ridé. 4. A deed from Ridé to Chouteau, dated Novem-

ber 16, 1784, for one arpent of land, described as bounded on one side by land of the purchaser, and on the other by the water mill of the purchaser. 5. Purchase at public sale on the 19th of April, 1792, by Auguste Chouteau, of 1½ by 40 arpens, belonging to the estate of Jacques Noisé, (or L'Abbé,) bounded by the lands of Gabriel Cerre, Auguste Chouteau and Madame Verdon. 6. Authorization from the lieutenant governor to Chouteau, excutor of Madame Verdon, to take possession of ½ by 40 arpens belonging to the estate. 7. Concession, dated January 24, 1790, by Stephen Mirot, governor general of Upper Louisiana, to Auguste Chouteau, of two small tracts adjoining the Laclede grant, one containing two by ten arpens, and the other 4 by 13½ arpens. 8. Mackay's survey, dated March 29, 1803, of 1390 arpens of land for Chouteau.

8. Proceedings before the board of commissioners upon Chouteau's claim to three tracts, containing respectively 8 by 80 arpens more or less, 2 by 10 arpens, and 4 by 13½ arpens. On the 24th of January, 1809, the board ordered the tract of 8 by 80 arpens to be surveyed conformably to the concession to Laclede Leguest, dated August 11, 1766. On the 7th of June, 1810, the survey having been executed and returned by Bent, deputy surveyor, the board granted the land to Chouteau according to the survey. Bent's survey calls for Dion on the north.

9. Plat and description of Brown's survey of one by forty arpens, confirmed to Laroche's representatives, by the second section of the act of congress of April 29, 1816. This survey is numbered 1464, calls for Dion on the north, and is wholly within the survey of the Chouteau Mill tract.

10. Duralde's survey, dated May 23, 1772, of one by forty arpens, conceded to Laroche, adjoining Condé on one side and Dion on the other.

11. Duralde's survey of Condé's concession of 2 by 40 arpens, adjoining Laclede on one side and Laroche on the other; also his survey of Dion's concession of one by forty

arpens, bounded on one side by Laroche and on the other by Deschamps.

12. Deed from Condé to L. Vachard, dated July 4, 1776, for three by forty arpens, described as bounded on one side by the land of *Larosa* and on the other by the fence of the commons.

13. Deed from Louis Vachard to Auguste Chouteau, dated October 19, 1784, for two by forty arpens, bounded on one side by land of Nicholas Beaugenon and on the other by land of Louis Ridé.

14. Deed from N. Bucho or Vucho to Victoire Verdon, dated November 20, 1788, conveying half an arpent in front by forty arpens in depth, bounded on one side by land of L'Abbé.

15. Deed from the heirs of Amable Guion (Dion,) dated January 14, 1809, to L. Ridé, confirming a sale made "about twenty-five years before," in consideration of a cow and a calf, of one by forty arpens, contiguous to Deschamps and Beaugenon.

16. An official sale of Ridé's estate, made May 25, 1788, at which there was struck off to L'Abbé one arpent of land, bounded on one side by the land of Mr. Cerre and on the other by land of Beaugenon.

17. Judicial sale of L'Abbé's estate, April 29th, 1792. Auguste Chouteau becomes the purchaser of one and a half arpens in front by forty in depth, described as bounded by the lands of Cerre, Chouteau and Verdon.

18. Marriage contract between Joseph Charleville and Victoire Verdon, dated July 15, 1797, by which a community was created between the parties as to all property, real and personal, then owned or thereafter to be acquired.

19. Deed from Victoire Charleville to her children, dated May 15, 1851.

20. Oral testimony, in substance as follows : Madame Verdon died in 1796, leaving six children, viz : Joseph, Louison and Godfrey, Harriet, Pelagie and Victoire, the plain-

tiff. Joseph died in 1805, Louison in 1810 or 1811, and Godfrey shortly after Joseph, all unmarried. Harriet married Bourgillon, who died before the change of government. Afterwards, about 1825 or '27 she married Clermont. She died without issue before the commencement of this suit. Pelagie married a Spanish officer and went to Havanna. The proof leaves it in doubt whether she is living or dead. Victoire married Joseph Charleville, who died in 1842 or 1843. At the close of the plaintiffs' evidence, the court declared that they were not entitled to the relief they sought, and they appealed to this court.

*J. Delafield,* for appellant. I. By the principles common both to the American and Spanish law, the purchase of the estate in controversy by Chouteau, acting in the two fiduciary capacities of executor and guardian, was void and passed no title. 2 Sug. on Vend. (Lond. ed.) 109. 1 Ball & B. 96. 2 ib. 116. 8 Wheat. 421. 6 ib. 481. 10 Pet. 269–81. 1 Mason, 341. 1 Story's Eq. §312, 317, 318. 12 Pet. 412. The civil law establishes the same rule. " *Tutor rem pupilli emere non potest; idemque porrigendum est ad similia, id est, ad curatores, procuratores, et qui negotia aliena gerunt.*" Pothier on Pos'n No. 64, 66. Dig. lib 18, tit. 1, 1. 34. Inst. lib. 1, tit. 21, 23. The only exception to this rule was in favor of a guardian, who may *palam et bona fide* purchase the ward's property at public auction. Code, lib. 4, tit. 38, 1. 5. This exception is not recognized by the Spanish law in America. *Michoud* v. *Girod,* 4 Howard, 559. The rule was never relaxed in favor of executors, under any circumstances whatever. 4 Rob. Rep. 201. See also, Dig. lib. 26, tit. 8, 1. 5, §3, lib. 26, 1. 5, §5. 11 Mart. Rep. 298. 9 Lou. Rep. 48. 14 ib. 114, 122. The earlier Spanish code says : " Guardians and executors cannot purchase any of the property which they administer, unless a decree should previously be given by the judge, stating its advantage to the union." Rec. lib. 4, tit. 5, p. 5. Nov. Rec. ib. No such decree was obtained in this case, and besides this was only al-

lowed to *guardians*. *Michoud* v. *Giroud*, 4 Howard, 559. But the later Spanish code expressly declares : " Guardians and executors cannot purchase any of the property which they administer." Rec. L. 23, tit. 11, lib. 5. Nov. Rec. L. 1, tit. 12, lib. 10. The Novissima Recopilacion also declares that such laws as are not found it are to be considered as obsolete, although contained in the former Recopilacion.

The Spanish governors and subordinate authorities had no power to decide causes or confer privileges, *contrary to the civil laws of Spain*. The laws prevailed in the colonies, as in the mother country, unless changed by custom, which, in such case, must be proved. Lieutenant governors, intendants of posts, &c., could adjudicate and execute the laws, but could not violate them. The commandant of a district was a judicial officer within his district, and acted as notary or *escribano*, and kept the records of his district. 2 White, 693, 695. II. If the purchase by Chouteau passed no title, the only remaining questions to be considered are, *prescription* as against the claimant, the statute of limitations or the staleness of the claim. 1. Prescription was abolished by the act of 1818, and besides it could not have run in this case for several reasons. 2. The plaintiff is not barred by the statute of limitations, because it could not run against an express trust created by the act of the wrong doer and because her disabilities were not removed until 1847. III. The confirmation is not conclusive against the rights of the plaintiff. It is only conclusive against the government and not against third parties. IV. If the confirmation to Chouteau is valid, it is only a resulting trust to the plaintiff. 4 Mo. Rep. 113. 5 Mo. Rep. 154. 9 ib. 714. 10 ib. 254. 11 ib. 164. 6 Cranch, 148. 2 Wash. C. C. R. 441. 10 Pet. 205-6.

*R. M. Field* and *F. M. Haight*, for respondents. I. The confirmation by the board of commissioners to Auguste Chouteau, under whom the respondents claim, is a conclusive bar to the relief sought by the plaintiffs. *Strother* v. *Lucas*, 12 Peters, 458. *Bissell* v. *Penrose*, 8 Howard, 340. *Landes*

v. *Brant*, 10 Howard, 370. *Landes* v. *Perkins*, 12 Mo. Rep. 255. II. It does not appear that Chouteau made any claim before the commissioners as the representative of Richelet Verdon. The lot claimed in this suit as belonging to her was in fact embraced by the concession to Laclede. This concession was presented by Chouteau, and may be regarded as the ground of his claim. III. Chouteau had ceased to be tutor of the children at the date of his claim and the proceedings before the commissioners; for his account was rendered as early as July 20, 1799. By the Spanish law, the tutor's account was to be rendered at the close of the tutorship. Schmidt's Civil Law of Spain, 37. IV. Chouteau acquired a good Spanish title to the lot of Madame Verdon in the common fields. 1. The lot was subject to public charges, and though three times offered for sale found no purchaser. It was, unquestionably, competent for Trudeau to transfer the lot to Chouteau to pay the public charges. The proceeding is analogous to the strict foreclosure of a mortgage in English practice. Our present administration law contains a provision founded on the same principle. R. C. 1845, tit. Administration, art. III, secs. 4, 5. The proceedings under the Spanish law, in case of pledge, are also analogous. Schmidt, 190. 2. Besides, the order of Trudeau was, in substance, the re-uniting of the lot to the domain and conceding it to Chouteau. This power cannot be questioned. *Strother* v. *Lucas*, 12 Pet. 450–7, and cases cited. The acts of a public officer are presumed to be within his authority. *United States* v. *Clarke*, 8 Wheat. 452. 3. Executors and guardians could purchase under the Spanish law with the assent of the judge. This point has been expressly decided. *McNair* v. *Hunt*, 5 Mo. Rep. 300. V. If there was any claim against Chouteau in respect to the lot of Richelet Verdon, the claim has long since been barred by force of the statute of limitations of December 17, 1818, and by prescription. VI. The plaintiffs' claim has become stale by lapse of time, and independently of any positive statutes of limitation, on the principles adopted by courts of equity, the

plaintiffs ought not now to have the relief they seek. *Randolph* v. *Ware*, 3 Cranch, 503, *ad finem*. *Prevost* v. *Gratz*, 6 Wheat. 481. *Piatt* v. *Vattier*, 9 Peters, 405. *Bowman* v. *Wathen*, 1 Howard, 189. *McKnight* v. *Taylor*, ib. 161. If a trustee purchases trust property, application must be made in a reasonable time or relief will be denied. 2 Powell on Mort. 500, n. 1. 4 Harr. & McH. 139. 7 J. C. R. 90. 14 S. & R. 333. 4 J. C. R. 310. 3 ib. 190. 11 J. R. 446. 3 J. C. R. 586. 4 Wend. 58. Lewin on trusts, 611.

GAMBLE, Judge, delivered the opinion of the court.

As the only evidence given in this case was given by the plaintiffs, and the court, on motion, decided that they had not made a case upon which they could recover, we are confined to the consideration of that case.

It sufficiently appears from the statements of the petition and the plaintiff's evidence, that the land now in controversy was embraced in a larger tract claimed by Auguste Chouteau before the first board of commissioners, for his own benefit and as his own property, and that his claim was confirmed by the board on the 7th June, 1810, and that a patent issued on that confirmation, dated the 16th of June, 1813. The plaintiffs claim that Chouteau, being executor of the will of Madame Richelet Verdon, their ancestor, authorized by the will to make sale of her property, became the purchaser of the property now claimed, at a public sale of her effects, and that such purchase was in violation of law and void; that the title thus acquired was exhibited before the commissioners by Chouteau and became the foundation of the confirmation which was made to him. This allegation states the foundation of the present suit, for if Madame Verdon did not own the property, or if Chouteau did not illegally acquire her title, or if that title was not the foundation of the confirmation made by the board, the plaintiffs have no pretence of right to the property. In support of the allegations in the petition, the plaintiffs gave in evi-

dence the account of the public sale of Madame Verdon's property, signed by the lieutenant governor and his assisting witnesses, and which came from the Spanish archives. The last entry is in these words, as translated : " Also another half arpent of land by forty arpens, situated back of the fort and between Don Auguste Chouteau and one Marly, and having been offered for sale on the two preceding Sundays, and on this, without any bidder presenting himself, and the said land being subject to the charges of fencing, which are now indispensable and would be costly to the said estate, and prejudicial to the creditors and heirs, Don Auguste Chouteau, offering to bear said charges, as the value of the land, the which was adjudged to him, in order that he should pay for or cause to be made the said fences ; and there being no more to sell, the present auction is closed."

The land embraced in this suit is described in the petition as a tract of one by forty arpens, confirmed to the representatives of Laroche, the survey of which is numbered 1464, situated in the common fields of St. Louis. There is shown in the evidence no conveyance from Laroche to any person, but there are conveyances in evidence for the lots originally surveyed as adjoining that of Laroche. As surveyed under the Spanish government, Laroche had one arpent by forty. On one side was a tract of one by forty arpens, surveyed for Dion, and on the other a tract of similar dimensions surveyed for Condé ; both of these surveys called for Laroche as adjoining. Several conveyances were given in evidence with the design of tracing the titles of these adjoining tracts to Chouteau, and showing that in at least one of them Madame Verdon was named as the proprietor of adjoining land. It is impossible, from the descriptions and recitals in these deeds, to say how much land Madame Verdon owned there, if she really owned any, for the Condé title is represented as covering three arpens by forty, when he sells it, and when his grantee conveys to Chouteau, it is described as two arpens by forty ; and Dion's tract, which appears to have been sold by his heirs for a cow and calf, is

called one arpent by forty, but in the public sale made of it afterwards, it is described as having one arpent and a half in front. It is apparent, upon an examination of these conveyances, that the parties to them were either ignorant of the real quantity of land they owned, or that they had acquired title to a larger quantity than was originally surveyed for Dion and for Condé, by purchasing adjoining lands. There is nothing to indicate that such increase of their quantities was not by the acquisition of that originally surveyed for Laroche. The only direct conveyance made to Madame Verdon was made by Vucho, for a tract of one half arpent in front by forty in depth. It is true, that when Chouteau filed his claim before the commissioners for the large tract which was surveyed for him under the Spanish government, and which included the land now in controversy, according to a plat filed with his claim, he also stated the titles to different parts of the larger tract, and while he claimed a large tract which had been originally conceded to Laclede Leguest, he also stated his right to one half arpent under the order made by the lieutenant governor in relation to the fence which the representatives of Madame Verdon were bound to make.

If the acts of Chouteau shall be held to amount to the admission that any title to any of this land was ever in Madame Verdon, the admission cannot be extended beyond the half arpent in front, for which she had a conveyance from Vucho, and it is difficult, if not impossible, to ascertain that the title of Laroche had ever become vested in her for any of the tract originally surveyed for him. But for the present the further consideration of the question, whether any title was shown in Madame Verdon to any of the Laroche tract, may be waived, as it will hereafter appear that Chouteau already owned the tract of Laclede Leguest, which interfered with the Laroche tract, and the title to which was confirmed by the board.

1. The question, whether Chouteau illegally acquired the title to the land which Madame Verdon claimed, rests upon the ground that, being executor of her will, he could not purchase

any part of the property which it was his duty to administer. In 1838, in the case of *McNair* v. *Hunt*, 5 Mo. Rep. 301, it was decided that, under the Spanish law, a person who was an executor and the guardian of minor heirs, might purchase the land of the deceased at a judicial sale, when the purchase was made with the consent of the judge, and that unless the minors impeached the sale within four years after they came of age, they were barred by the prescription of four years. In *Michoud et al.*, v. *Girod et al.*, 4 Howard 559, the Supreme Court of the United States expresses a different opinion in relation to the right of an executor to purchase any of the property of the estate which he is to administer. The opinion delivered by Mr. Justice Wayne, after stating the rule as recognized in the English and American courts of equity, that one occupying a fiduciary relation shall not be permitted to purchase the subject of the trust, shows that the same rule prevails under the civil law, and very briefly states the Spanish law on the question. It is not thought necessary to consider the question in this case, for it is apparent that we have not before us an ordinary case of the sale of property belonging to a succession, to the executor of the deceased.

We are to take the act of the lieutenant governor transferring the property to Chouteau as truly stating the facts of the case. It is there stated that the land had been offered for sale on two Sundays in succession without any bidder, and that on the day of sale there was no bidder, and that, as there existed a necessity for the repair of the fence of the common field, and Chouteau was willing to take that burden upon himself for the land, it was accordingly adjudged to him. It is obvious that this transaction has connection with some municipal regulation existing in the village of St. Louis, in relation to the common field of the villagers, and although the regulations adopted by the syndics, with the approbation and sanction of the lieutenant governor, are not spread out upon the record, yet we find them in *Mackay* v. *Dillon*, 4 Howard, 431. The common field cultivated by the inhabitants was protected from the cattle and

horses by a fence, which, running in front of the common field, inclosed the village and such part of the adjacent land as was used in common for pasturage, each owner of a common field lot being obliged to maintain the fence in front of his own lot. Instead of inclosing the field with a fence, the animals were confined within a fence which inclosed the village and common. This fence was made, in part, along the front line of the common field lots. The mode of maintaining this fence is seen, so far as there were written regulations, in those which are published in *Mackay* v. *Dillon*. In *Strother* v. *Lucas*, 12 Peters, 450, it is said : " It appears from the evidence, that there was an officer in the village called by the inhabitants a syndic, and in the Spanish laws a regidore, whose duty and authority were to see that the common fences of the forty arpen lots were kept in repair. He would direct them to be inspected, and if found out of repair, would direct the owner of the lot in front of which it was defective to make the repairs ; if the owner were on a journey, the syndic would have the repairs made, and make the owner pay his share on his return ; otherwise he would give the land to another person who would make the share of the fence. This was a regulation in villages by the authority of the commandant and municipal authorities, in conformity with the laws of Spain." We have thus an idea of the existence of regulations in the enforcement of which village communities were interested, and which were made the grounds for transferring the title of such property from one person to another, and we can understand the public considerations which induced the lieutenant governor to transfer this land to Chouteau. When it had been offered for sale and no person was willing to purchase it, and when there was a public necessity that there should be an owner who would bear the burden of making the fence, the lieutenant governor transferred it to one who was willing to bear the charge. When we are considering the effect of such an act, we are liable to fall into great errors, if we allow ourselves to be influenced by the ideas we now have of the regular and formal mode of disposing of

valuable property, in a regulated and matured condition of society, under fixed and known laws, administered by officers belonging to different departments, each with prescribed powers. The officer who made this disposition of the property united in himself the powers which, under our system, would belong to distinct offices. He was the chief executive officer, and, at the same time, he was the highest judicial officer in this part of Louisiana. He made concessions of the royal domain; he ordered and conducted judicial sales; he acted as a notary, and seems to have taken the control of all public affairs in the province. The inhabitants looked to him as the representative of their sovereign. Such an officer, at a post where there were collected a small number of inhabitants, where property was to be had for the asking, disposes of a piece of land of some twenty arpens, belonging to the estate of a deceased individual, for which no person will bid, and being subject to a public burden, he gives it to the executor if he will bear its share of the public charge. To this case it is attempted to apply the rule that an executor cannot purchase the property of the estate he is required to administer, and after the title has been confirmed by the United States, and forty years after it has been patented, after the principal part of it has been for many years in a flourishing city and covered with costly structures, it is said the lieutenant governor, who disposed of the property more than fifty years ago, simply made an ordinary sale of it to the executor, and the whole title was and is but a mere nullity. The most natural, and, as we think, the most correct view to take of the act of the lieutenant governor is, that it was a governmental act, transferring the property upon considerations affecting the public, as well as from regard for the interests of those concerned in the estate, and therefore we hold that the rule in relation to an executor's purchase at his own sale, occupying the position both of seller and purchaser, does not apply to the present case. It is also believed to be but a regular and natural consequence of this view, that no court in the succeeding government, after the act of the lieutenant governor has

been recognized, and the title under it confirmed by the United States, can review and annul the act and the title thus recognized and confirmed. So that, if the land was held by Chouteau, under the confirmation of his claim originating in the act of the lieutenant governor, his title could not be disturbed by the plaintiffs.

2. But the case presents another aspect as decidedly unfavorable to the claim of the plaintiffs. When Chouteau presented his claim for confirmation, he filed, as was required, the documentary evidence of his title, and the first document in date, and that which seems to be chiefly regarded in the subsequent action of the commissioners, was a concession signed by St. Ange and Labuxière, dated 11th August, 1766, in which there was conceded to Laclede Leguest a tract of eight arpens in front by eighty arpens deep, extending from the land of Dion to the little river, and having eighty arpens in depth. The title to this tract was acquired by Chouteau at a judicial sale of the property of the grantee. He filed the plat of a survey made under the Spanish government in 1803, of the tract thus granted, and that plat comprehends the land involved in this controversy. In the minutes of the proceedings of the board, of September 12, 1808, the claim of Chouteau is thus noticed on the record: "Auguste Chouteau, assignee of Laclede Leguest, claiming a tract of eight arpens more or less in front, by eighty arpens in depth, situated in the prairie of St. Louis, produces a concession from St. Ange, lieutenant governor, dated August 11, 1766, and a certificate of survey of said land, dated 23d August, 1803, for 1336 arpens." At the same time, as appears from the entries in the minutes, he was claiming two small tracts which had been granted to him, adjoining the larger tract, one of which was of two by ten arpens, and the other four by thirteen. On the 24th of January, 1809, the board order a survey to be made of the three tracts, the larger according to the concession to Leguest, the other two according to the concession to Chouteau. The survey was accordingly made and returned to the board. The

final action of the board upon the claim was had on the 7th June, 1810, and there it is represented as the claim of Auguste Chouteau, assignee of Laclede Leguest, claiming eight by eighty arpens, and the decision of the board is in these words: "The board grant to Auguste Chouteau one thousand and thirty-one acres of land, under second section of the act of congress, &c., as described in the plat of survey ordered by the board and returned by Silas Bent, principal deputy surveyor, dated 29th November, 1809." This survey made by Bent, as appears not only by its calls, but by the subsequent United States surveys and plats given in evidence, includes the land in controversy in this action. The confirmation is according to the survey of Bent, and that survey is according to the concession to Laclede Leguest. Under this survey, the land was patented to Chouteau. Now it is clear that neither the original title of Laroche, nor any title derived from the estate of Madame Verdon, formed any part of the basis of this confirmation, nor is either noticed in the proceedings before the board. It appears by the documents filed with Chouteau's claim, that he had purchased the tract of Laclede Leguest, on which was a mill, as early as 4th July, 1779, and therefore any subsequent purchase of any other part of the same tract was but the extinguishment of an opposing title. The case is thus presented of a concession and a confirmation of the claim under it, located in the act of confirmation by reference to a particular survey, the confirmation made by the first board of commissioners in 1810, and a patent issued thereon in 1813, and an attempt to disturb the title under this confirmation and patent, on the ground that Chouteau had illegally purchased the claim of Madame Verdon to a part of the land, although such purchase was not in any measure the ground of the confirmation.

3. If the plaintiffs had shown, satisfactorily, that Madame Verdon owned the tract originally surveyed for Laroche, and had then relied upon the confirmation to Laroche's representatives, under the act of 29th April, 1816, their case would not have been strengthened, for, as between such confirmation and

the previous confirmation of an opposing title by the commissioners, the law is well settled by numerous decisions of the Supreme Court of the United States, that the elder confirmation is the better title both at law and in equity. The doctrine of the different cases is summed up in *Landes* v. *Brant*, 10 Howard, 370, in this language : " According to the former decisions of this court, all controversy was concluded by the confirmation, as regarded two questions : First, it settled that Clamorgan (the claimant before the board) was the true and proper assignee of Dodier (the original grantee) through the various mesne conveyances by which Clamorgan claimed ; secondly, that Clamorgan had the oldest and best claim to the land, as against every other claimant under the Spanish government. In explanation of our former decisions, it is proper to remark, it is held that, as between two claimants under that government, setting up independent imperfect claims, the courts of justice had no jurisdiction : that, in such cases, it appertained to the political power to decide to whom the perfect title should issue ; and when then this was done, no controversy could be raised before the courts of justice impeaching the confirmation." As between the Laroche claim, as confirmed by the act of 1816, and the confirmation of the claim of Chouteau under Laclede Leguest by the first board of commissioners, the confirmation of Chouteau is not to be disputed. Nor can any person come into the courts of justice setting up title under the Laroche grant, and claim that he shall have the benefit of a confirmation which was made upon the title of Laclede Leguest, even if he could show that the person who owned the Leguest title made an illegal or even a fraudulent purchase of the Laroche title. The proper department of the government, in discharge of its political duties and obligations, has passed the fee in this land to the person owning the title originally given to Laclede Leguest. We are not at liberty to say that it shall pass from him to the person owning the Laroche claim. The other ground of defence, the lapse of time, would deserve consideration, and would be passed upon, if enough had not

already been said upon the two points which have been considered.

We hold that there was no such vice in the act of the lieutenant governor, by which Chouteau acquired the land, which was mentioned in the report of sale as the property of Madame Verdon, as to render it void, and, secondly, that Chouteau's title, confirmed under Laclede Leguest, cannot be disturbed by the plaintiffs claiming under Laroche or Madame Verdon.

The judgment of the Circuit Court is, with the concurrence of the other judges, affirmed.